UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 3:10CR222 (RNC) |
| | : | |
| ROBERT RIVERNIDER | : | March 28, 2014 |

**GOVERNMENT'S REPLY TO DEFENDANT'S RESPONSE TO THE GOVERNMENT'S SUPPLEMENTAL MEMORANDUM REGARDING RESTITUTION**

The Government submits this reply to the defendant's response [Doc. 623] to the Government's supplemental memorandum regarding restitution [Doc. 619]. The defendant's eleventh-hour response takes issue with previously undertaken loss calculations that were based on evidence adduced at trial, a full day loss hearing by this Court over six months ago, a subsequent sentencing hearing and prior briefings by the Government not previously challenged by the defense. Consistent with defendant's efforts to ignore the substantial real estate fraud scheme, the defendant does not provide much challenge to the substantial losses caused by his real estate scheme, instead focusing his discussion primarily on the substantially smaller Ponzi scheme. As discussed in previous submissions, the Government's loss calculations for restitution relating to both the real estate and Ponzi schemes are supported by the record and offer a reasonable assessment of losses directly caused by the defendant's illegal acts. In fact, as has been discussed at the September 2013 loss hearing and in submissions to the Court, the calculations provided adopt a conservative methodology in part for the practical reason that the defendants lack the financial resources to make more than the most nominal repayments. Advancing a more aggressive methodology, even if appropriate, is not an efficient use of additional CJA funds or the parties' or Court's time.

For the reasons discussed in prior hearings, prior pleadings and as supplemented further below, the Court has a reasonable basis to adopt the previously proposed restitution order, as amended, for restitution for losses caused by both the real estate and Ponzi schemes. Alternatively, to address most of the defendant's present complaints regarding the loss calculations regarding the Ponzi scheme, the Government now submits with this filing an even more, albeit arguably unduly conservative, methodology for restitution relating to that scheme. This last proposed methodology *assumes* the defendant made all promised monthly payments on the pitched Ponzi scheme investment plans until the scheme blew up, even when the available evidence and testimony plainly suggests he did not. Even adopting such an assumption, the monetary losses caused by the Ponzi scheme remain substantial.

**1. <u>Procedural Background</u>**

The Court here is versed with much greater factual information than most judges who are presented with restitution issues. The Court sat through two weeks of testimony outlining the Ponzi scheme, where the Court repeatedly saw and heard the standard pitch Rivernider and his coconspirators gave to get investors to invest, including the documents created to make the sale and the promises of steady, substantial monthly returns. The Court further learned that Rivernider, as the organizer and leader, had direct oversight and control of the bank accounts that took in the investors' monies. He orchestrated the fraudulent misrepresentation of investing success by making the routine, monthly payouts, which he knew were, as in any Ponzi scheme, simply giving prior investors monies obtained from new investors, or, at best, returning investors their previously invested monies and misleading those investors into thinking the monies were investment returns. As a result, Rivernider convinced early investors to invest; convinced certain

of those investors to put new money in; and then convinced later investors to invest for the first time.

During the trial and further developed in the record for sentencing, the Court became fully versed in Rivernider's real estate scheme, with the common themes of Rivernider establishing a standard fraudulent program that destroyed any true arms-length negotiation of purchase price – a program when Rivernider could set the sales price for a property by telling the buyer not to worry as Rivernider would cover down payments/earnest money, closing costs, taxes and then mortgages for two years. The Court also heard the testimony of one of Rivernider's own conspirators who not only related her own experience with Rivernider, but walked the Court through emails directly involving Rivernider and the fraud. As demonstrated in the conspirator's testimony and emails with Rivernider, the fraud involved keeping the lenders in the dark about the program and misrepresenting the true purchase price of homes, the source of down payments/earnest money, and the source of mortgage payments. The Court also had the exhibit binders with the hundreds of exhibits that reflected the overarching fraudulent scheme and the related additional misrepresentations used by Rivernider and his co-conspirators to further the scheme (including overstated borrower income, understated borrower liabilities, stacking of property purchases, and misrepresentation of whether the home was purchased as a secondary or investment property). Together these lies made up what was referred to at sentencing as Rivernider's fraud playbook. A number of the relevant emails were referenced in the Government's Version of Offense [Doc. 468-3], provided separately to the Court, and subsequently filed manually with the Clerk's Office. [Doc. 613].

But the trial was not the only source of evidence painting a detailed picture of the frauds and how the frauds took place. The losses caused by the defendant's conspiracies and schemes

to defraud investors and victim lenders had been addressed previously in briefings for the September 4, 2013 loss hearing [Doc. 494][1] and in the oral presentation, testimony, exhibits, and summary charts provided by the Government at that hearing, which defense counsel did not challenge. After the hearing, the Government filed a supplemental memorandum specifically identifying material fraud in properties that were selected by the defense at random and subject to discussion in the loss hearing. [Doc. 501] The Government provided additional information regarding the disbursement of funds [Doc. 575], and then filed a lengthy sentencing memorandum on October 24, 2013 [Doc. # 524]. The issues discussed in that Memorandum included loss calculations, *id.* at 20-22, restitution, *id.* at 50-53, as well as Exhibits 371A and 371E, which set forth the losses sustained by victims of the No More Bills fraud and real estate scheme, respectively, *id.* at 51.

At the defendant Rivernider's sentencing on December 18, 2013, the Government advised the Court that it was awaiting some additional information to confirm the total losses in the case and that it would file a Proposed Restitution Order with the Court once that additional information was received and the loss numbers were made as accurate as possible. On February 14, 2014, the Government filed a Proposed Order of Restitution [Doc. # 619] in the above-captioned matter.

At no time prior to February 14, 2014, did the defense provide the Government with any documents or information wherein the defendant disputed the actual loss (and thus restitution) numbers other than by way of (a) stating at the September 4, 2013 loss hearing that if the Court accepted the Government's proffered evidence, then the defense agreed there was sufficient

[1] This detailed memorandum (and related hearings) addressed the *actual* losses sustained by the victims in this case and the methodology used by the Government in arriving at loss amounts. As discussed below at 5-6, the analysis for calculating actual, rather than intended losses, for Guidelines purposes provides sufficient factual basis for a restitution award.

evidence in the record of the Court to make a finding of more than $20,000,000 in losses, and (b) making certain post-plea assertions that the defendant did not really do anything wrong.

**2. <u>The Legal Standard for a Restitution Award</u>**

In his response, the defendant tries to suggest that the final restitution figure need be calculated with such mathematical rigor as to make calculation impossible, and that without such exactitude the victims should be denied any recovery for the significant losses caused by the defendant. That is simply not the law.

The Mandatory Victims Restitution Act of 1996 ("MVRA"), codified largely at 18 U.S.C. §§ 3663A and 3664, requires the sentencing court, with limited exceptions, to order restitution to the victims of certain crimes. Section 3664(f) provides that, regardless of the defendant's economic circumstances, the court, in its order of restitution, "shall order restitution to each victim in the full amount of each victim's losses as determined by the court."

Under 18 U.S.C. § 3664(e), the Government bears the burden of establishing the loss sustained by a victim by the preponderance of the evidence. *United States v. Lundquist*, 731 F.3d 124, 131 (2d Cir. 2013) ("To the extent there is '[a]ny dispute as to the proper amount or type of restitution[,] [it] shall be resolved by the court by the preponderance of the evidence, with the government bearing the burden of proof") (quoting 18 U.S.C. § 3664(e)). But to meet this burden of proof, the Government must simply demonstrate that "there is more likely than not some direct relation between the injury asserted and the injurious conduct alleged." *Id.* (quotation omitted) (citing 18 U.S.C. § 3664(e)). The court may only consider "actual loss" to victims in ordering restitution. Though this is different from the combination of actual and intended loss the court may consider for the Sentencing Guidelines calculation, "the quantity and quality of evidence the district court may rely upon to determine the amount of loss is the same

in both contexts." *United States v. Germosen*, 139 F.3d 120, 130 (2d Cir. 1998). Thus, evidence that is sufficient to establish actual loss for the Guidelines calculation is sufficient to establish actual loss for a restitution order. Importantly, in this case, the Government sought to prove up only actual loss caused by the defendant's fraud for Guidelines purposes, not intended loss, so the loss analysis was effectively the same for Guidelines purposes as it is for the restitution calculation.

Further, the Government need not establish an exact amount of actual loss to meet its burden for the restitution calculation. As the Second Circuit has put it, "we have never used the word 'actual' in this context to mean 'mathematically precise.'" *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013) *cert. denied*, 13-939, 2014 WL 497653 (U.S. Mar. 10, 2014). Instead, the government must provide "only a reasonable approximation of losses supported by a sound methodology." *Id.; see also United States v. Lane*, 13-428-CR, 2014 WL 752270 (2d Cir. Feb. 27, 2014) (citing *Gushlak* and holding evidence "plainly sufficient" to establish a "reasonable estimate of losses" where restitution calculation was based entirely on pre-sentence report); *Germosen*, 139 F.3d at 129 (affirming a sentencing loss and restitution calculation based entirely on the testimony of two coconspirators who admitted that their figures were estimates).

In this case, the Government has developed a "reasonable approximation of losses supported by sound methodology" that is clearly sufficient to award restitution to both the final lender victims in the real estate scheme and the victims in the No More Bills Ponzi scheme.

**3. The Proposed Restitution Award for the Lender Victims Is <u>Accurate, Reasonable and Conservative.</u>**

The substantial portion of both the fraud and losses in this case relate to the defendant's comprehensive real estate scheme, and, as a result, the Government addresses the defendant's

arguments to this portion of the restitution order first. The defendant takes issue with the methodology employed for the calculation of mortgage fraud-based losses of approximately $21.3 million relating to the 104 properties involved in the scheme, which, despite the prior briefing and hearings, requires a short response.

First, the defendant argues that the Government did not provide a sufficient factual basis that the properties at issue involved mortgages obtained by fraud, referencing just one statement from the September loss hearing. Def. Mem. at 8. The defendant, however, ignores the substantial factual record before the Court justifying the Court's findings on fraud loss. The record includes, but is not limited to:

(1) The trial testimony of various witnesses who explained the defendant's supervisory role in the schemes, his ownership and control of bank accounts, and the various electronic and other records seized that were in the defendant's control. These witnesses included coconspirator Tosha Wade, whose testimony was later introduced in part at the loss hearing and as part of the record at sentencing. Wade explained in detail Rivernider's fraud playbook and gave context to the scope of the fraudulent deals being pushed by Rivernider.

(2) The many exhibits of emails to and/or from Rivernider included in the sentencing record, which again and again confirmed Rivernider's illegal course of conduct to defraud the lenders.

(3) The lengthy trial testimony of Barbara Flores from GMAC, who outlined and explained what information in the mortgage process was important and a range of circumstances where loans would be denied for fraud.

(4) The trial testimony of witnesses like Eric Reid, whom Rivernider and his coconspirators convinced to buy a property in Tennessee, sight unseen, by promising to cover all costs and pay the ongoing mortgage.

(5) The many exhibits reflecting that Rivernider had a very accurate picture of many of his clients' poor financial circumstances, which bolstered the evidence that Rivernider knew full well that he was pushing through the purchase of multiple properties they many of his clients could not afford.

(6) The detailed admissions made by the defendant as part of his guilty plea reflecting the repeated frauds on lenders and confirming all the other oral and documentary evidence.

(7) The bank records of Rivernider's Cut Above Ventures accounts reflecting earnest money payments, down payments, tax payments and mortgage payments being made on a range of mortgages held in the name of his clients.

From the extensive record, the Court could reasonably conclude and did conclude that in the identified 104 loans Rivernider was time and again following his fraud playbook to defraud lenders. In addition to the above, in determining the scope of the fraud, the Court had the defendant's own spreadsheets, taken off Rivernider's home computer, which listed at least the 104 properties under his control. Defining the scope of the scheme and entirely consistent with the trial testimony, Rivernider's own spreadsheets track estimated down payments, mortgage payments, and taxes that Rivernider would be paying, consistent with the documentary evidence prepared for trial. *See* Doc. 497 (discussing the factual record seized from Rivernider's computer). That evidence showed Rivernider providing borrowers with money to cover earnest money and down payments, and then covering borrowers' mortgage payments and taxes. From Rivernider's own documents and the other records, as well as the testimony of Agent West at the

September 2013 hearing, the Court had evidence as to each property from which the only reasonable inference was that these deals were rife with fraud.

Additionally, *the defense* picked out random loans at the loss hearing and inquired further as to what fraud was reflected in those deals. To provide an accurate picture, the Government subsequently reviewed the specific files on each of those randomly selected properties and submitted a supplemental pleading identifying with specificity the fraud involved. [Doc. 501]. At the loss hearing, as part of the evidence of loss, the Government provided spreadsheets identifying the specific property, the outstanding principal balance and the monies obtained by the lender as a credit against the loan. Updated versions of these calculations were provided yet again in the Government's supplemental memorandum regarding restitution. [Doc. 610]. Nothing more is required to establish a comprehensive basis for the District Court's "reasonable approximation of losses supported by sound methodology."

Second, the defendant relies heavily on the Eleventh Circuit case *United States v. Singletary*, 649 F.3d 1212 (11th Cir. 2011), to argue that the Government has not established a sufficient factual basis for this Court to order restitution to the victim lenders. *Singletary* is easily distinguished, however, because the record in this case is much more substantial than the record in *Singletary*. In that case, the Eleventh Circuit rejected an order that the defendant pay $1 million in restitution to the Department of Housing and Urban Development ("HUD") in connection with a mortgage fraud scheme. Without explanation, the district court had initially "intuited" losses of $1 million for the defendant's Guidelines calculation after rejecting the government's assertion, based solely on the testimony of three loan officers with "credibility problems," that the defendant had caused $1,732,585.52 in losses. *Id.* at 1217-18. In a restitution hearing, the Government then sought to prove that the defendant had caused

$3,042,205 in losses (including $1,732,585 directly from the mortgaged properties), relying solely on the testimony of two HUD employees who did not speak about loss amount. *Id.* at 1218. Rejecting the Government's proposed restitution calculation, the court once again found, without explanation, that the Government had established restitution of "at least $1,000,000." The Eleventh Circuit reversed this ruling, holding that the district court's unexplained restitution calculation was not "supported by factual findings." *Id.* at 1222. In contrast, the record in this case clearly supports a finding, by the preponderance of the evidence, that $21,303,440 is a "reasonable approximation" of the losses suffered by the victim lenders.

In an effort to shoehorn this case into *Singletary*, the defense focuses on snippets of Special Agent West's testimony at the loss hearing in September 2013 and apparently ignores the substantial and extensive factual record composed of both testimony and exhibits already before the Court identifying the defendant's pervasive fraud. Special Agent West's testimony simply provided the last bit of support to an already complete record. Further, nothing in the record suggests that the Court did not give Agent West's testimony weight, and the record in no way supports the defense's suggestion at Def. Mem. 8-9 that West's testimony had "credibility problems," which was the *Singletary* court's concern with the testimony of certain loan officers and HUD employees. In sharp contrast, the record here is replete with the evidence of the defendant's extensive mortgage fraud, as discussed above, its scope and the attendant losses.

Third, the defendant lamely tries to narrow the scope of the fraud by suggesting that Wells Fargo (the institution) was a coconspirator in the fraud because it employed Shellie Kemp, who has pled guilty to defrauding her own employer, Wells Fargo. Def. Memo. at 10. But there is an obvious distinction between rogue employees and the institution that employs them. *See United States v. Demauro*, 581 F.2d 50 (2d Cir. 1978) (generally, a corporation is only liable for

the criminal acts of its employees "if done on its behalf and within the scope of the employees' authority"). By engaging in criminal acts which included, for example, falsifying income to circumvent Wells Fargo's loan requirements, *see, e.g.*, Government's Version of the Offense at 28-30; Exhibits attached to Version, Exhs. 117, 124, 125, 129, 130, 144 (emails with Rivernider, Kemp and others to conspire to defraud her employer), Kemp clearly acted in a way that reflected her interests diverged sharply from that of her employer.

Far from being encouraged to engage in fraudulent conduct, Kemp only admitted falsifying loan application information for Rivernider during the course of the criminal investigation. In a proffer session with the FBI (disclosed to the defense), she admitted to keeping her fraud from her employer and acknowledged that she had been expressly told that the loan applications she was providing could not include any funny business. Again, far from including her employer, when she continued later to work with Rivernider and began again to push through loans, she made clear that Rivernider had to keep any reference to Rivernider's company off any closing papers. Exh. 124. In the same email chain, again far from suggesting that Wells Fargo as an organization was complicit with Kemp and Rivernider, she warned Rivernider not to use her Wells Fargo email, which she appeared to suggest Wells Fargo could monitor, but to stay in touch on her personal email. *Id.* In short, the record reflects that Rivernider, Kemp and the other coconspirators did their best to operate in the shadows, hiding from the victim lenders how they were pitching deals that made no economic sense.

<u>Fourth</u>, the defendant asserts, with no support, that "it is unclear whether the lenders actually lost anything." Def. Mem. at 11. Despite the defendant's unfounded assertion, the losses reflected in the restitution order, in fact, do reflect the actual losses incurred by the institutions relating to the loans at issue on the 104 properties. Rather than extrapolate losses, to

obtain unpaid principal balances, the FBI contacted lenders or reviewed filings in foreclosure actions or other land records, or, in limited circumstances, calculated the balances based on the principal loan amounts as reduced by the anticipated monthly payments. The detailed methodology is reflected in several exhibits, including Exhibit C, attached to the Government's Supplemental Memorandum [Doc. # 619], under the column heading Source of Sales Data. In this way, the net principal loan figures take into account actual monies the defendant paid to lenders on the loans during the real estate fraud scheme. From that specific balance, the agent deducted the value of the sale of the underlying collateral, with the source of the sale information again reflected on the spreadsheet submitted to the Court. Thus, the spreadsheet presented properly identifies the losses caused to the institutions as a result of the fraud.

The defendant relies on *United States v. Archer*, 671 F.3d 149, 171 (2d Cir. 2011), to support his bald assertion that the victim lenders were co-conspirators and thus are not entitled to any restitution from the defendant. *Archer* can be easily distinguished. In that case, the defendant, an immigration lawyer, was convicted of visa fraud for submitting falsified visa applications on behalf of clients. The Second Circuit remanded to the district court to determine which clients were entitled to restitution for their application fees, recognizing that some – but not all – of the clients had testified that they had actual knowledge that their applications were fraudulent. Attempting to draw a parallel to the knowingly fraudulent visa applicants in *Archer*, the defendant makes broad statements about the lending practices of some of the victim lenders. But the defendant does not point to any admissions by any lending institutions relating to the particular loans at issue in this case. The defendant's argument seems to be that, because several victim lenders made other "risky" loans during this time, they had actual knowledge of the defendant's fraudulent scheme. Of course, such a position is inconsistent with Kemp's own

words and actions keeping Wells Fargo in the dark. This argument is entirely without support and is an attempt to "blame the victim" for the defendant's own actions.[2] *United States v. Thomas*, 377 F.3d at 243-44 (2d Cir. 2004)(citations omitted). *See also United States v. Moore*, 923 F.2d 910, 917 (1st Cir. 1991) (approving jury instruction that "it is not a defense that the bank might have prevented its losses had it better "internal controls or procedures."); *United States v. Callipari*, 368 F.3d 22, 37 (1st Cir. 2004), *vacated on other grounds*, 543 U.S. 1098 (2005) (approving exclusion of "blame the victim" line of cross-examination, noting that "[t]he court was well within its discretion to exclude evidence suggesting that [the victim], rather than [the defendant] and his co-conspirators, was to blame for the loss."); *United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980) (rejecting defense based on the victim's failure to have taken steps to uncover the fraud, holding "[t]he victim's negligence in not a defense to criminal conduct.").

In short, the restitution award to the lenders for the real estate fraud of $21,303,440.37 reflects a detailed accounting and is plainly a "reasonable approximation of losses supported by sound methodology."[3] In fact, because the restitution order does not seek an award to the lenders of pre-judgment interest, post-judgment interest or the foreseeable attorneys' fees incurred in the foreclosure process -- all arguably recoverable under the restitution statutes -- the proposed order is extremely conservative in assessing the true economic cost on the lenders of the defendant's fraud.

---

[2] The defendant also suggests that the victim lenders may have sold the loans before the underlying property was foreclosed or otherwise liquidated. Def. Mem. at 12. While various loans were sold and then returned to the initial lender when fraud was identified, it is beside the point as secondary market purchasers of fraudulently obtained loans are also entitled to restitution under the MVRA. *United States v. Yeung*, 672 F.3d 594, 601 (9th Cir. 2012).

[3] As noted in the Government's previous submission, this restitution figure does not seek to recover losses suffered on certain loans not in default or where the entity extending the loan is defunct. *See* Doc. 619 at 5.

**4. The Proposed Restitution Award for the Ponzi Scheme Victims Is Accurate, Reasonable and Conservative.**

Much of the focus of the defendant's response is on the markedly smaller, albeit still significant losses, caused by the defendant's Ponzi scheme. For the reasons discussed below, the Government's present proposed restitution order of $2,185,146, relating to the Ponzi scheme, is both conservative and reasonable. However, given the defendant's inability to pay any meaningful restitution, and to further limit the scope of any possible objection, the Government proposes to the Court an even more conservative methodology for the portion of the restitution order addressing the Ponzi scheme losses. The following addresses various arguments raised by the defense in its response:

First, the defendant tries to sow confusion by mischaracterizing the context in which various loss figure options relating to the Ponzi scheme were presented to the Court. As explained in its prior pleadings, the Government proposes a methodology to determine loss, a methodology which looked at only those victims who gave new money to Rivernider at the end of the scheme whereby, according to the terms of Rivernider's own investment pitch, the investment monies would not have been recouped in whole. *See, e.g.*, Doc. 619 at 3-4. By limiting the victims to the last investors and what were typically their last (or only) investments, the Government began its analysis already understating possible restitution. This is because, as the Court is aware from testimony at trial, Rivernider and his coconspirators convinced certain investors to invest monies at points in time that were prior to the period subject to the Government's analysis and either were promised balloon payments that never came or did not receive routine payments as promised.

The Government reduced the figures determined to be applicable to the review period by monies that were plainly repaid to the investors regarding their new investment, represented at

the September loss hearing as $2,417,184.06. The Court could adopt this figure as reasonable. However, to give the defendant the benefit of the doubt, the Government reduced these figures by any payments reflected in the bank records that appeared associated with payments to these individuals for the new investment by a uniquely identifiable amount and the date of the month paid. Subtracting these "pattern" payments results in the reduced restitution figure of $2,170,145.86. This figure, as amended to a revised figure of $2,185,146, remains an appropriate restitution figure using the more conservative methodology.

The defendant also points to two discrepancies which need be addressed only briefly. The defendant notes the difference between the final restitution figure of $2,170,145.86 in the previous proposed order [Doc. 619-1] and the figure of $2,160,145.86 that was cited at the loss hearing in Exh. 371A. The lower figure included calculations involving an additional individual, Tim Cos., who, after the Government credited that individual with repayments that might possibly have applied to his case, ended up with repayments exceeding his investment by $10,000. He was thus removed as a victim suffering actual loss for purposes of the final restitution order. The defendant also notes that the sum of the line-by-line Ponzi-scheme losses listed in the proposed restitution order, filed February 14, 2014 [Doc. 619-1], do not equal the listed subtotal of $2,170,145 on the proposed order, which is the subject of the detailed accounting set forth in Exh. B [Doc. 619-2]. The Government has now identified that, in drafting the proposed restitution order, Michael Mastoris was incorrectly listed as incurring losses of $17,274.18 which were, in fact, suffered by Michael McNeal, and Mr. McNeal was mistakenly left off the proposed order. When McNeal is appropriately added as a listed victim and Mastoris' losses are included as $442,033.16, the figures match the subtotal of $2,170,145.86 discussed above and reflected in Exh. B to Doc. 619.

Second, the heart of the defendant's argument as to the Ponzi scheme loss calculation is the claim that the financial records are incomplete in reflecting all the investment returns made by the defendants to the victims under the proposed investment plans and that the Government's methodology is "likely to fail to account for substantial payments made to NMB participants." Def. Mem. at 6.[4] The Government submits that the assumptions made to credit payments as discussed above sufficiently address this issue. Yet to quiet the defendant's challenge, the Government proposes an alternative calculation that in its simplicity addresses the defense argument. This calculation is *overly* conservative as it *assumes* that the defendant actually did make repayments to all Ponzi victims at the rates promised by his plans through January 2008, months after the record reflects that the defendant had begun picking and choosing whom to repay. *See, e.g.*, Government's Version at 12-13 and relevant Exhibits (outlining the selective cutting off of payments in the Fall of 2007). By February 2008, the payments Rivernider chose to make were drastically lower than each of the previous 10 months, as funds dried up, and the payments were primarily for mortgages relating to the real estate scheme. From February 2008 onward there were numerous instances where checks were returned for insufficient funds.

With this analysis, the Government also gives the defendant credit for the occasional payment made after the February 2008 period to certain investors on their investment when such payments could be identified. Under this methodology, the defendant still owes substantial restitution to the Ponzi scheme victims of approximately $1,500,053, *see* Exh. B1 (attached), in addition to the over $20 million of losses caused the victim lenders by the real estate scheme discussed above. In addition, this analysis divides the Ponzi victims into two camps, those that

[4] The defense asserts that the Government "elected" not to obtain the detailed financial records of banks and other institutions. Def. Mem. at 3 n.1. In fact, the financial analyst made reasonable efforts to obtain the records, but was unable to do so. Nor was the defense able to obtain the records.

invested once and lost money and those that had invested previously. The $1.5 million is made up of losses of $664,606 caused to the 22 victim groupings who had not invested in No More Bills other than during the period subject to review. In addition, the defendant caused at least $835,447 in losses to the remaining 11 victim groupings, which includes persons who had made prior investments with the defendant before the period subject to review. Exh. C1 (spreadsheet of analysis).[5]

Third, the remainder of the defendant's response appears to raise two distinct challenges to restitution to victim groupings made up of persons who had made investments prior to the period subject to review and how to treat payments made to those persons. The defendant appears to suggest that these victims' restitution amounts should be reduced by monies the defendant paid and continued to pay on the prior investment plan(s), if those amounts exceeded the prior investment(s). Def. Mem. at 4.[6] The defendant also argues the records are too incomplete to determine what prior payments had been made on the prior investments to these victims. Def. Mem. at 5-7. As to the initial question, the "returns" paid out on an initial investment that exceeded the amount of the initial investment are not credited against a subsequent investment, particularly where, as here, the continued payments on the initial investment, induced the victim to give the defendant more money.[7]

[5] This analysis also understates losses to the victims, because it is based solely on the monies paid by investors that was represented to be included as part of the proposed investment plan. Typically Rivernider would charge a $4,000-$5,000 fee for his services, which was not included in the analysis.

[6] Under the Government's analysis, where the limited number of NMB victims invested more than once in the NMB plan, the returns are mathematically extrapolated and the defendant is credited with returns on those prior investments up to the amount of the investment. Any excess returns on the prior investments were not credited against any restitution owed on the last investment for the reasons discussed above.

[7] This argument, of course, has no bearing on the majority of the victims identified in the either proposed restitution order who had no prior investment. Nor, as the defense has conceded at Def. Mem. at 4 n.2, does this argument impact the relevant Guidelines loss analysis.

Because the Government demonstrated actual, rather than intended, loss for sentencing purposes, the Government may properly rely on the same evidence to calculate restitution. *United States v. Germosen*, 139 F.3d 120, 130 (2d Cir. 1998). According to the United States Sentencing Commission,

> "In a case involving a fraudulent investment scheme, . . . loss shall not be reduced by the money or the value of the property transferred to any individual investor in the scheme in excess of that investor's principal investment." In other words, in Ponzi scheme cases where payments are routinely made to some or all of the victims, the defendant will receive no credit for payments made to "any individual investor in the scheme in excess of that investor's principal investment."

U.S.S.C., Loss Primer (§2B1.1(b)(1)) at 26 (March 2013) (citing 18 U.S.C. §2B1.1(b)(1 n.3(F)(iv)).

As the Eight Circuit has explained, "[a] repeat investor is essentially in the same position as a new investor for these purposes. To hold otherwise would be to reward defendants for conduct that perpetuates, and constitutes a component of, the Ponzi scheme." *United States v. Alfonso*, 479 F.3d 570, 573 (8th Cir. 2007). In this case, the defendant enticed some victims to make additional investments in No More Bills by paying (fraudulent) returns on their initial investments. To subtract any gains these victims made on their initial investments from their losses in subsequent investments would be to reward the defendant for luring the victims back in as his scheme fell apart.

The defendant asserts that this actual loss analysis applicable to Guidelines calculations should not apply to the restitution analysis. To support his position, the defendant cites *United States v. Hsu*, 669 F.3d 112, 121 n.3 (2d Cir. 2012) to argue that sentencing and restitution calculations are "appropriately distinct." However, *Hsu* can be clearly distinguished on two grounds. First, the court in *Hsu* did not actually calculate restitution, merely mentioning restitution calculations in the abstract as a point of comparison in a footnote. Second, the *Hsu*

court stated that the analysis for restitution and sentencing are "appropriately distinct" because, "in the criminal sentencing context… we look at the *greater* of either actual losses suffered to the victims or the losses the defendant intended to accomplish by virtue of the scheme." *Id*. (emphasis in original).

Unlike *Hsu*, which involved an intended loss calculation, Rivernider's sentencing calculation and proposed restitution order are both based on *actual* loss.[8] In *Hsu*, the court counted reported "gains" that Ponzi scheme victims chose to "reinvest," rather than ever actually receive, toward an intended loss calculation. In contrast, the No More Bills victims actually received returns on initial investments, which prompted them to make separate investments, using separate funds, within the ten-month calculation period. Thus, the defendant is flatly incorrect to argue that the Guidelines and restitution analysis should differ: both involve actual loss, where the returns on one investment may not offset the losses from a separate investment involving separate funds. In fact, at least one court has distinguished, for restitution purposes, between *Hsu*-style "reinvestments" and separate, subsequent investments of the kind made by several No More Bills victims. *See United States v. Warren*, 2005 WL 2347354, at *4 (W.D. Va. Sept. 23, 2005) *report and recommendation adopted*, 2005 WL 2806071 (W.D. Va. Oct. 25, 2005) (refusing to count "reinvestment[s] of earnings" reported to victim toward restitution calculation because they were not "deposits of capital"). The proposed restitution calculation does not create a "windfall" for repeat investors in No More Bills, as the defendant states. Instead, by counting victims' last investments separately, the calculation simply refuses to give

[8] The defendant is correct to state that restitution is limited to "the victim's provable actual loss." Def. Mem. at 4, n.2. Again, however, the loss calculation in the Government's proposed restitution order is the same calculation of actual – not intended – loss to which the defendant raised no objection at the sentencing stage of this case.

the defendant credit for using prior and ongoing returns to convince victims to give him even more money.

Fourth, the defendant's additional argument that he would need more financial records to determine actual payments made on prior investments is irrelevant in light of the most – conservative methodology proposed by the Government. The Government's most conservative analysis gives the defendant credit for making the payments on the prior investments as promised.[9] Thus the defendant is given credit for payments he may not have made, and accordingly any issue with the completeness of the Bank of America records would be appropriately addressed by the methodology used to assess loss.

Fifth, the defendant spends considerable discussion on Rivernider's financial deals with Ms. Moore and Ms. Walters. Def. Mem. at 3-5. Both these individuals present a significantly longer and more checkered investment history with the defendants than most of the remaining victims because many of the remaining victims made just one investment late in the Ponzi scheme, as discussed above. In addition, both these individuals had preexisting romantic ties to Rivernider's principal codefendant Robert Ponte, who was in different degrees and at different times controlling their finances and the monies in their accounts. As the Court will recall, Ms. Moore invested early in the NMB scheme, and then was deceived into participating in multiple real estate deals. Ms. Walters was convinced to invest in NMB early and then defrauded into investing $100,000 again in November 2007, as the scheme was collapsing.

As to Moore, based on the Government's proposed mathematical calculation, the defendant's argument is irrelevant because the new analysis assumes, despite the available

[9] The defendant's reference to lack of available MyICIS records, however, is a particular red herring, As the Court will recall, the MyICIS matter concluded in 2006, with the matter under investigation and a cease and deist order entered in early 2007. This entirely predated most of the investors' involvement with Rivernider.

record, that all promised payments to her were made consistent with the promised plans. As a result, Moore does not suffer mathematically calculated loss under this conservative analysis, although her credit remains destroyed because of the losses suffered in the real estate scheme.[10]

Ms. Walters remains a victim with losses of $80,000 under the mathematical calculation on her November 2007 investment of $100,000. The mathematical calculation does reflect that Ms. Walters, as one of the earliest initial investors, was made whole on her initial investment. The defendant's contention that he not be required to repay Ms. Walters for basically stealing her last $100,000 because he continued to pay promised returns on her earlier investment plan in order to hide his ongoing scheme runs contrary to the law, as discussed above. *See supra* at 17-19.[11]

<u>Sixth</u>, the defendant's remaining arguments appear to be that Rivernider revised payment plans with the input of new money, and thus changed payments to victims. Def. Mem. at 7. Having reviewed email correspondence, negotiated plans, and the available payment records, the financial analyst was very much aware of such changes in payment plans and previously took such payment changes into account in both previously in determining appropriate allocation of payments and in the present, more conservative, assessment of restitution losses.

---

[10] The Government has identified Moore investing $162,000 with the NMB plans. Based on a review of available records from February 1, 2007 until January 2008, the Government identifies Cut Above Ventures sending $177,134 to Moore's account. However, of the $177,134, the Government has identified $59,501 as monies deposited to boost her bank balances to defraud those lenders reviewing those balances or for down payments ($32,995) for real estate relating to the real estate scheme.

[11] The investment plan for the $100,000 invested in November of 2007 was supposed to begin on December 15, 2007. The only return now identified as relating to that plan is the $10,000 payment on December 18, 2007. The remaining payments appear to be consistent with repayments on the prior plans.

## Conclusion

For the foregoing reasons, the Government respectfully requests that the Court adopt a restitution order consistent with the Government's position herein. In light of the arguments above, the Government has submitted a revised proposed restitution order consistent its prior submission [Doc 619-1], correcting the missing line-item and slightly modifying loss figures as to Moore and Walters consistent with that methodology, and a second proposed restitution order, adopting the most conservative methodology noted above, Exh. B1 (attached), if the Court finds that the most conservative order is appropriate in that the defendant is unlikely to make anything more than nominal restitution payments in the future.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

*/s/John H. Durham*

JOHN H. DURHAM
COUNSEL TO THE U.S. ATTORNEY
Federal Bar No. ct05087

*/s/Christopher W. Schmeisser*

CHRISTOPHER W. SCHMEISSER
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct14806
christopher.schmeisser@usdoj.gov

157 Church Street, 25TH Floor
New Haven, CT 06510
Tel.: (203) 821-3700
Fax: (203) 773-5377

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing on March 28, 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_________/s/__________
John H. Durham
Assistant U.S. Attorney